# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| SEBASTIAN CORDOBA, individually and on behalf of all others similarly-situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | CIVIL ACTION FILE NO.: |
| vs. | ) ) | 1:15-CV-03755-MHC |
| DIRECTV, LLC, individually and as successor through merger to DIRECTV, Inc., | ) ) ) ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT

### The 2009 Injunction

1.      On December 12, 2005, the United States of America, on behalf of the Federal Trade Commission, brought suit against DIRECTV for various alleged violations of federal telemarketing laws in the matter styled *United States v. DIRECTV, Inc.*, No. 05-1211 (C.D. Cal. Dec. 12, 2005).  (Complaint for Civil Penalties and Injunctive Relief (Ex. 8) at ¶ 16).

### RESPONSE:

DIRECTV objects on the grounds that this fact is not material to the motion.

2.     On December 14, 2005, Judge David O. Carter of the United States District Court for the Central District of California entered a Stipulated Judgment and Order for Permanent Injunction Against DIRECTV, Inc. enjoining DIRECTV from, among other things, failing to monitor its marketers, failing to monitor its marketers' marketing campaigns, continuing to do business with marketers it knows to be violating the TCPA, and from committing future violations of federal telemarketing laws (the "2005 Injunction").  (Ex. 9).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion and further objects on the grounds that the statement mischaracterizes the injunction to the extent it implies that DIRECTV had committed prior violations of the telemarketing laws.   The settlement cited was entered into "without adjudication of any issue of fact or law" and DIRECTV did not admit liability.

3.     On or around April 15, 2009, the United States of America, on behalf of the FTC, brought suit against DIRECTV again for alleged violations of federal telemarketing laws in the case styled *United States v. DIRECTV, Inc. et al.*, No. 09-02605 (C.D. Cal. April 16, 2009).  (Ex. 8).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

4.     On May 14, 2009, Judge David O. Carter of the United States District Court for the Central District of California entered a Stipulated Judgment and Order for Permanent Injunction Against DIRECTV, Inc. enjoining DIRECTV from, among other things, failing to monitor its marketers, failing to monitor its marketers' marketing campaigns, continuing to do business with marketers it knows to be violating the TCPA, and from committing future violations of federal telemarketing laws (the "2009 Injunction").  (Ex. 10).

**<u>RESPONSE:</u>**

DIRECTV objects on the grounds that this fact is not material to the motion and further objects on the grounds that the statement mischaracterizes the injunction  to the extent it implies that DIRECTV had been found to have committed prior violations of the telemarketing laws.   The settlement cited was entered into "without adjudication of any issue of fact or law" and DIRECTV did not admit liability.   Moreover, the injunction includes separate restrictions for "authorized telemarketers" (which Telecel was not) and "authorized marketers" (which Telecel was).   Authorized marketers are not subject to many of the restrictions described in this paragraph.

5.     The 2009 Injunction superseded the 2005 Injunction, "except for Section VIII.C of the Prior [2005] Injunction, which shall remain in full force and effect." (2009 Injunction (Ex. 10) Section XII).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

6.     The 2009 Injunction defines an "Authorized Marketer" as "a business or other entity with whom DIRECTV has entered into an agreement authorizing the solicitation of DIRECTV goods or services." (2009 Injunction (Ex. 10) at p. 3).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

7.     The 2009 Injunction defines an "Authorized Telemarketer" as "a person that has received express, written authorization from DIRECTV to use telemarketing to market DIRECTV goods or services." (2009 Injunction (Ex. 10) at p. 3).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

8.     Because Telecel, pursuant to the CDA, has received express, written authorization from DIRECTV to use telemarketing to market DIRECTV goods or

services, Telecel is an "Authorized Telemarketer" under the terms of the 2009 Injunction.  (Haley Decl. Ex. C (CDA) (Doc # 108-3) at p. 22 (DTV0000057)).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  The CDA does not, in itself, provide authorization for a retailer to conduct even commercial telemarketing but rather sets forth the steps that such a retailer must take prior to receiving authorization.   There is no evidence in the record that Telecel ever received such authorization from DIRECTV.

9.     Because Telecel, pursuant to the CRA and IRA, has entered into an agreement authorizing the solicitation of DIRECTV goods or services, Telecel is also an "Authorized Marketer" under the terms of the 2009 Injunction.  (Haley Decl. Ex. A (IRA) (Doc # 108-1); Haley Decl. Ex. B (CRA) (Doc # 108-2)).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion, and in any event mischaracterizes the CRA and IRA to the extent it implies the CRA and IRA authorize "cold calling."

10.     Pursuant to the 2009 Injunction, DIRECTV, "whether acting directly or indirectly through Authorized Telemarketers," is permanently restrained from "[i]nitiating any outbound telemarketing call to a person when:  1. that person has

previously stated to DIRECTV or an Authorized Telemarketer that he or she does not wish to receive an outbound telephone call made by or on behalf of DIRECTV . . . [or] that person's telephone number is on the National Do Not Call List . . ." (2009 Injunction (Ex. 10) Section I.A).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion. Furthermore, the evidence cited does not support the statement, as § I(A)(2) of the 2009 injunction includes several exceptions that Plaintiff omits in his quotation, including customers who have provided express written consent to receive such calls, or customers with whom DIRECTV has an established business relationship.

11.    Pursuant to the 2009 Injunction, DIRECTV is obligated to "conduct a reasonable due diligence investigation of a person before making a person an Authorized Telemarketer, to ensure that the person has established and actively enforces effective policies and procedures for compliance with the Telemarketing Sales Rule, including procedures to prevent the initiation of outbound telemarketing calls to numbers on the National Do Not Call Registry . . ." (2009 Injunction (Ex. 10) Section II.A).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

12.     Pursuant to the 2009 Injunction, DIRECTV is obligated "to monitor outbound telemarketing campaigns conducted by an Authorized Telemarketer to determine whether . . . [a]ny telemarketing call is placed only to a telephone that is . . . not on the National Do Not Call Registry and not on an individual do not call list maintained by DIRECTV or any of its Authorized Telemarketers . . ." (2009 Injunction (Ex. 10) Section II.D.1.a).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion. Furthermore, the evidence cited does not support the statement, as § II(D)(1) also allows DIRECTV's authorized telemarketers to place calls to "a telephone number that is . . . on the National Do Not Call Registry, provided that the customer either has given his or her express agreement in writing to receive telemarketing calls at that number, or has an established business relationship with DIRECTV."

13.     Pursuant to the 2009 Injunction, DIRECTV is obligated "to monitor Authorized Marketers to determine whether they are initiating contact with consumers through outbound telephone calls to telemarket DIRECTV goods or services[.]" (2009 Injunction (Ex. 10) Section III.A).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

14.     DIRECTV never addressed the 2009 Injunction with Telecel.  (Diaz Dep. (Ex. 2) at 202:3-6).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

### The Contractual Relationship between DIRECTV and Telecel

15.     Telecel Marketing Solutions, Inc. ("Telecel") applied to become an authorized DIRECTV, LLC ("DIRECTV") dealer in 2003.  (Ex. 1).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

16.     In its application, Telecel stated that "our sales force is a combination of direct sales and telemarketing." (Ex. 1 at DTV0000173).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

17.     Telecel has been marketing on behalf of DIRECTV since 2003.  (Diaz Dep. (Ex. 2) at 33:11-24).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

18.     Telecel has been expressly authorized to conduct outbound telemarketing, or cold-calling, on behalf of DIRECTV since July 1, 2010, pursuant to its Commercial Dealer Agreement ("CDA").  (Haley Decl. Ex. C (CDA) (Doc # 108-3), p. 22 (DTV0000057)).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  The CDA does not, in itself, provide authorization for a retailer to conduct even commercial telemarketing but rather sets forth the steps that such a retailer must take prior to receiving authorization.   There is no evidence in the record that Telecel ever received such authorization from DIRECTV.

19.     DIRECTV and Telecel entered into two other agreements authorizing Telecel to market on behalf of DIRECTV:  a March 1, 2006, Independent Retailer Agreement ("IRA") and an April 7, 2008, Customer Referral Agreement ("CRA"). (Haley Decl. Ex. A (IRA) (Doc # 108-1); Haley Decl. Ex. B (CRA) (Doc # 108-2)).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

20.     Pursuant to the CDA, IRA, and CRA, Telecel is authorized to "to market, promote and advertise the sale of DIRECTV Programming Packages." (Haley Decl. Ex. A (IRA) (Doc # 108-1), § 2.5; Haley Decl. Ex. B (CRA) (Doc # 108-2), § 2.5; Haley Decl. Ex. C (CDA) (Doc # 108-3), § 2.5).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

21.     To consummate sales, Telecel is given access to DIRECTV's system to input prospective customer information, and DIRECTV then approves or disapproves of the sale.  (Montmorency Dep. (Ex. 3) at 95:9-96:6; 175:24-176:9; Diaz Dep. (Ex. 2) at 23:5-24:16).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  DIRECTV does not give Telecel access to its entire "system." Rather, Telecel has access to specific order entry software ("DWS") necessary to submit orders to DIRECTV.  Montmorency Dep. (Ex. 3) at 95:9-96:6; 175:24-176:9. Telecel does not have access to DIRECTV's customer records or customer database. Diaz Dep. 24:17-23, 47:15-48:10.

22.    Telecel is obligated to sell only DIRECTV's audio/video multichannel entertainment programming packages or equipment, and cannot sell or market any similar or competing products on behalf of a DIRECTV competitor.  (Amendment to IRA (Ex. 5) at §1.3; Amendment to CRA (Ex. 6) at § 1.3; Haley Decl. Ex. C (CDA) (Doc # 108-3) at § 1.4).  Telecel is authorized to use DIRECTV's logo and trademark.  (Haley Decl. Ex. A (IRA) (Doc # 108-1), § 9; Haley Decl. Ex. B (CRA) (Doc # 108-2), § 8; Haley Decl. Ex. C (CDA) (Doc # 108-3), §9).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited, as Telecel is allowed to use DIRECTV's logo and trademark only in compliance with the terms of a usage manual and other applicable restrictions.  DIRECTV otherwise admits that the Court can properly consider this evidence for the purposes of the motion.

23.    Pursuant to DIRECTV's contracts with Telecel, DIRECTV is entitled to control the marketing materials and publications used by Telecel, and Telecel is prohibited from marketing DIRECTV services except as designated and approved by DIRECTV:

(a)    Telecel "shall market, promote, and advertise" DIRECTV's services "as directed by DIRECTV" and "using such marketing tactics,

channels, methods and at such frequency as DIRECTV may reasonably designate." (Haley Decl. Ex. A (IRA) (Doc # 108-1), § 2.5; Haley Decl. Ex. B (CRA) (Doc # 108-2), § 2.5; Haley Decl. Ex. C (CDA) (Doc # 108-3), § 2.5).

       (b)    "All advertising, marketing and promotional materials related to DIRECTV . . . shall be subject to DIRECTV's prior approval.  DIRECTV may withhold approval in its sole and absolute discretion of the use by [Telecel] of any marketing tactic, channel or method that DIRECTV reasonably believes does not fit within its marketing strategy." (Haley Decl. Ex. A (IRA) (Doc # 108-1), § 2.5; Haley Decl. Ex. B (CRA) (Doc # 108-2), § 2.5; Haley Decl. Ex. C (CDA) (Doc # 108-3), § 2.5).

**<u>RESPONSE:</u>**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.  DIRECTV objects to the classification of the evidence as showing that DIRECTV "control[led]" Telecel's marketing materials.

24.    Pursuant to DIRECTV's contracts with Telecel, DIRECTV is entitled to control the programming packages marketed by Telecel.  Telecel may market only those DIRECTV programming packages pre-authorized by DIRECTV, which DIRECTV can change at any time "in its sole and absolute discretion." (Haley

Decl. Ex. A (IRA) (Doc # 108-1) at §§ 1.1(c), 3.1, 3.2, 5.3, Ex. A, Schedule 6.3;

Haley Decl. Ex. B (CRA) (Doc # 108-2) at §§ 1.1(c), 4.1, 4.2, 6.1, Ex. A; Haley

Decl. Ex. C (CDA) (Doc # 108-3) at §§ 2.1, 2.5, 2.10, 3.1, 3.2 4.3, Schedule B).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the

purposes of the motion.

25.    DIRECTV requires that Telecel "maintain books and records relating

to its activities on behalf of DIRECTV for a minimum of three (3) years" and that

DIRECTV may inspect such books and records "for compliance hereunder."

(Haley Decl. Ex. A (IRA) (Doc # 108-1), § 2.9; Haley Decl. Ex. B (CRA) (Doc #

108-2), § 2.9; Haley Decl. Ex C. (CDA) (Doc # 108-3), § 2.9).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the

purposes of the motion.

26.    DIRECTV requires that "at least one of [Telecel's] locations must be

a storefront location (i.e., a retail store), unless otherwise agreed by DIRECTV in

writing." (Haley Decl. Ex. A (IRA) (Doc # 108-1), § 2.1; Haley Decl. Ex. B (CRA)

(Doc # 108-2), § 2.1).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

27.    DIRECTV requires that Telecel "shall prominently display, in a high traffic area at each of its locations, in a manner reasonably directed by DIRECTV, (a) point of sale materials provided or approved by DIRECTV . . ." (Haley Decl. Ex. A (IRA) (Doc # 108-1), § 2.2; Haley Decl. Ex. B (CRA) (Doc # 108-2), § 2.2.

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

28.    DIRECTV controls who Telecel may use to market and sell DIRECTV's services:  only Telecel employees unless otherwise expressly authorized by DIRECTV.  (Haley Decl. Ex. A (IRA) (Doc # 108-1), § 2.4; Haley Decl. Ex B (CRA) (Doc # 108-2), § 2.4; Haley Decl. Ex. C (CDA), § 2.4) (Doc # 108-3).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.  DIRECTV objects to the classification of the evidence as showing that DIRECTV "control[led]" who marketed and sold DIRECTV services.

29.     The CDA reserved DIRECTV's right to review Telecel's telemarketing scripts and "how the call list was compiled" to ensure that "residential, cellular, emergency and guest/resident phone lines were omitted from inclusion[.]" (Haley Decl. Ex. C. (CDA) (Doc # 108-3) at DTV0000058).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited, as there is no evidence that Telecel ever had any telemarketing scripts for DIRECTV to review or used the policies described in the CDA.

30.     The CDA reserved DIRECTV's right to control, require, and review Telecel's do-not-call procedures and training materials for same.  Pursuant to the CDA, Telecel was obligated to submit to DIRECTV the following:

   (a)     "a separate sworn statement of compliance with all such [Do Not Call] registration and/or purchase and DNC scrubbing requirements";

   (b)     "copies of all materials used to train the live operators who will be making the calls (such materials should address . . . honoring Do Not Call requests . . .)"; and

   (c)     "a sworn statement regarding internal DNC compliance."

(Haley Decl. Ex. C (CDA) (Doc # 108-3) at DTV000058).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited, as there is no evidence that Telecel ever had any telemarketing scripts for DIRECTV to review or used the policies described in the CDA.

### The Operational Relationship between DIRECTV and Telecel

31.     Sasha Montmorency was DIRECTV's area sales manager in charge of the Telecel relationship during the period September 2010 to December 2011 and May 2014 to December 2015.  (DIRECTV's Amended Objections and Responses to Plaintiff's First Set of Interrogatories ("DIRECTV Interrogatory") (Ex. 7) at No. 10; Montmorency Dep. (Ex. 3) at 28:17-29:14).  Ms. Montmorency was the "principal person at DIRECTV who was interacting with Telecel." (Montmorency Dep. (Ex. 3) at 50:2-13).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

32.     The DIRECTV area sales manager in charge of Telecel's relationship, including Ms. Montmorency, is "the person most familiar with" Telcel's marketing practices.  (DIRECTV Interrogatory (Ex. 7) No. 15).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

33.     According to Ms. Montmorency, she and Telecel would meet by phone "maybe once a week.  Once every two weeks." (Montmorency Dep. (Ex. 3) at 37:4-13).  Ms. Montmorency and Telecel would meet in person "Once a month. Sometimes more if needed, but more or less, once a month is a fair statement." (Montmorency Dep. (Ex. 3) at 37:14-19).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

34.     Ms. Montmorency reported to Micky Girgis, DIRECTV's Director of Sales for the region in which Telecel operates.  (Montmorency Dep. (Ex. 3) at 41:16-42:5, 45:4-47:25, 125:4-7).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  Ms Montmorency testified that she reported to multiple people during her time as an ASM, including David, Rich Nock, and Mr. Girgis. Montmorency Dep. (Ex. 3) at 41:2-42:5.

35.    DIRECTV and Telecel met regularly.  (*See* composite Exhibit 45 (evidencing regular meetings between DIRECTV and Telecel)).

**RESPONSE:**

DIRECTV denies that the evidence supports Plaintiff's characterization of meetings as "regular." The exhibit reflects calendar scheduling for four in-person meetings between July 2012 and December 2015, as well as nine conference calls, an invitation to a webinar, and an invitation to a reception.

36.    Telecel operates two call centers, one in Maryland and one in El Salvador.  (Diaz Dep. (Ex. 2) at 99:24-100:20).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

37.    DIRECTV pre-approved Telecel's El Salvador center.  (Diaz Dep. (Ex. 2) at 156:12-157:4).  DIRECTV had to provide prior approval before Telecel opened its El Salvador call center because DIRECTV has "strict" requirements regarding its "overseas" call centers and Telecel has to "cooperate 100%." (*Id.*).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

38.    Telecel has staffed between twenty and thirty employees at its El Salvador call center.  (Montmorency Dep. (Ex. 3) at 151:5-8).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

39.    With DIRECTV's approval, Telecel's El Salvador call center can now seat more than fifty callers.  (Ex. 4 at DTV0006039).

**RESPONSE:**

DIRECTV objects on the grounds that this statement mischaracterizes the evidence.  The exhibit does not indicate that DIRECTV approved particular seating levels.

40.    Ms. Montmorency has "no idea" if anyone at DIRECTV conducted an inquiry into Telecel's business practices prior to its hiring, and "d[id]n't know if anybody [at DIRECTV] had to approve" Telecel's call center.  (Montmorency Dep. (Ex. 3) at 69:20-70:2, 148:3-12).

**RESPONSE:**

DIRECTV objects on the grounds that Ms. Montmorency's personal knowledge of prior inquiries or approvals regarding Telecel, which was a

preexisting dealer before she first had contact with Telecel (Montmorency Dep.

(Ex. 3) at 35-36) is not material to the motion.

41.    Pursuant to DIRECTV's contracts with Telecel, DIRECTV is

permitted and obligated to provide training and training materials regarding

DIRECTV's programming packages, but only "as DIRECTV reasonably deems

necessary." Haley Ex. A (IRA) (Doc # 108-1), § 2.3; Haley Ex. B (CRA) (Doc #

108-2), § 2.3; Haley Ex. C. (CDA) (Doc # 108-3), § 2.3.

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the

purposes of the motion.

42.    Ms. Montmorency and other DIRECTV representatives have

conducted online and in-person trainings with Telecel, including at Telecel's El

Salvador and Maryland call centers.  (Montmorency Dep. (Ex. 3) 148:13-16,

151:16-20, 153:2-23, 21:17-22:18, 57:2-58:11; Ex. 54; Ex. 30 at DTV0006235;

Ex. 31 at 0000853; Ex. 22 at DTV0006277; Ex. 32 at DTV0000926; Ex. 33 at

DTV0001005-06; Ex. 34 at DTV0001010; Ex. 35 at DTV0001203; Ex. 36 at

DTV0001372; Ex. 37 at DTV0001396-1400; Ex. 38 at DTV0003433; Ex. 39 at

DTV0006335).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

43.     According to Ms. Montmorency, the trainings are "mainly" "offer driven," but include other practices, such as billing, and never touched on the TCPA in any way.  (Montmorency Dep. (Ex. 3) at 74:2-11, 83:20-84:22, 72:5-16, 152:17-20).  During the trainings, DIRECTV representatives would "go around and listen to some calls" and "sometimes give feedback." (Montmorency Dep. (Ex. 3) at 153:2-23).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

44.     Trainings also included "training on how to use DIRECTV systems and place orders." (Diaz Dep. (Ex. 2) at 204:6-10).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

45.     Documents show that trainings would also include training on "sales techniques" and "fraud management" or "prevention." (Ex. 4 at DTV0006041; Ex. 30 at DTV0006235).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

46.    Terming the incentive program a "Call Center Launch Incentive," DIRECTV launched an incentive program for Telecel in the first quarter of 2016 wherein DIRECTV would "train all new and existing reps on offer, sales techniques, fraud management & quality." (Ex. 4 at DTV0006041).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

47.    After conducting the training, Ms. Montmorency e-mailed that it was an "extremely successful Telecel El Salvador trip." (Ex. 22 at DTV0006277).  Ms. Montmorency noted that the "call center is 3 times as large as his last one," and that with the incentive program, Telecel "committed to not only giving us 800 activations between the 2 months but in surpassing that so we return and announce another incentive before the end of the year." (Ex. 22 at DTV0006277).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

48.     When asked whether any of her visits to Telecel's call centers included checking on their physical operations to determine if Telecel was "conducting themselves according to required policies or procedures," Ms. Montmorency answered that she did not because "that's not my job," that it "is assumed that they're conducting everything by our guidelines," and that there was nobody "else who did have that job" that she knows of.  (Montmorency Dep. (Ex. 3) at 132:5-133:9).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

49.     DIRECTV provides Telecel with market information to help DIRECTV and Telecel decide where Telecel's marketing efforts are best placed. (Ex. 31 at DTV00000853-858; Diaz Dep. (Ex. 2) at 175:10-16).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  Mr. Diaz testified that the purpose of the market information was to allow the *retailer* to decide if it "want[ed] to do some marketing in those areas."   Nothing in the cited evidence indicates that DIRECTV could or did decide "where Telecel's marketing efforts are best placed."

50.     Telecel regularly won sweepstakes, or incentive prize packages, for its performance on behalf of DIRECTV, including trips to the World Cup, Copa America, and Santiago de Chile.  (Diaz Dep. (Ex. 2) at 178:10-16; Ex. 46).[1]

**RESPONSE:**

DIRECTV objects on the grounds that it is not material to the motion. DIRECTV further objects to the extent the reference to "on behalf of DIRECTV" is intended to assert a legal conclusion.

51.     Telecel advertises a 1-800 number used only for DIRECTV advertisements on which it can receive incoming calls.  (Diaz Dep. (Ex. 2) at 19:22-20:6, 21:16-21).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  In fact, Mr. Diaz testified that "we probably use the same [number] at that point" for other products, including when he used to sell DISH services.

52.     DIRECTV would regularly update the programming packages Telecel was authorized to sell.  (Ex. 40).[2]

**RESPONSE:**

---

[1] Exhibit 46 is a composite exhibit containing e-mail correspondence regarding competitions won by Telecel and paid for by DIRECTV.
[2] Exhibit 40 is a composite exhibit showing updates to DIRECTV's programming packages.

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

53.     DIRECTV provided advertising support and controlled the content of Telecel's marketing.  (Diaz Dep. (Ex. 2) 177:7-22; Ex. 41;[3] Ex. 4 at DTV0006036-6045).  For instance, DIRECTV reviewed, approved, and financed Telecel advertising to the tune of $24,762.00 in 2012 alone.  (Ex. 41 at DTV0001520-46 (listing invoices); Ex. 41 at DTV0001554-55).  According to the February 2016 incentive program, "DIRECTV currently supports Telecel with $10k a quarter in advertising/Co-Op." (Ex. 4 at DTV0006040).

**<u>RESPONSE:</u>**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited, as none of the cited materials indicate that DIRECTV "controlled the content of Telecel's marketing" or that DIRECTV "reviewed and approved" Telecel's advertising.   To the extent the statement provides evidence that DIRECTV from time to time made certain funds available to support Telecel's advertising,  DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

---

[3] Ex. 41 is a composite exhibit containing e-mail correspondence wherein DIRECTV reviews and approves Telecel's advertising.

54.    Ms. Montmorency "f[ou]ght for [Telecel] internally to be able to do things that we normally cannot do." (Ex. 42 at DTV0001152).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence cited to the extent it implies the statement in question relates to anything other the financial support program reflected in the cited email.

55.    DIRECTV and Ms. Montmorency were aware that Telecel was experiencing "tremendous growth" which coincided with its knowledge of Telecel's cold-calling practices and Plaintiff's receipt of unwanted calls.  (Ex. 21 at DTV0006015).  Telecel showed growth of more than 550% between the first quarter of 2014 and the third quarter of 2015.  In the first quarter of 2014, Telecel made just 158 sales (or activations).  (Ex. 21 at DTV0006015).  By the fourth quarter of 2014, those sales had more than tripled to 507.  (Ex. 21 at DTV0006015).  By the third quarter of 2015, those sales increased by more than 550% to 873.  (Ex. 21 at DTV0006015; Ex. 4 at DTV0006038).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence cited, as nothing in the evidence cited indicates that DIRECTV had "knowledge of Telecel's cold-calling practices and Plaintiff's receipt of unwanted calls."  To the

contrary, the cited email specifically indicates that Telecel's main marketing tactic is "radio," not cold-calling.  Furthermore, the statement is not material to the motion.

56.    In the same e-mail in which Ms. Montmorency outlined Telecel's "tremendous growth," she noted that Telecel "is opening a large call center in El Salvador.  Can have 60+ sales agents.  He wants to know if we can help in any way." (Ex. 21 at DTV0006016).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

57.    As of February 2016, Telecel was DIRECTV's "2nd largest dealer in the NE." (Ex. 4 at DTV0006038).  As of that time, Telecel was "trending for 300 [activations] a month" with the "potential to be at 400+ a month" because a "new call center launching in El Salvador that can fit upwards of 50 seats." (Ex. 4 at DTV0006039).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

58.    DIRECTV conducts in-depth monitoring [sic] Telecel's business practices and its sales, such as manipulations of information Telecel inputs into

DIRECTV's system at the point of sale.  (*See, e.g.*, Ex. 27 at DTV0000375-85; Ex. 28 at DTV0002065-67; Ex. 44 at DTV0002100-02; Ex. 50 at DTV0001040; Ex. 53).  DIRECTV not only conducted investigations into such practices, but also generated notices to Telecel when its sales would not be approved based upon the information it provided.  (*See* Ex. 53).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence cited, as nothing in the cited materials shows that DIRECTV conducted "in-depth" reviews of Telecel on any given issue, much less that the review covered the entirety of Telecel's business practices and sales.  Instead, the evidence shows that in response to certain circumstances, certain Telecel account activations would be escalated and investigated as appropriate.

### DIRECTV's Knowledge of Telecel's Calling Practices

59.    On June 5, 2014, DIRECTV employee Manuel Escobar in the department sent an e-mail to Ms. Montmorency, Mr. Girgis, Ms. Haley, and Ms. Riley, stating that "Telecel Marketing contacted [an existing DIRECTV customer] about opening a new account" and "[t]hese were cold calls since the customer hadn't inquired about new service." (Ex. 12 at DTV0005510).

**RESPONSE:**

DIRECTV objects to the admissibility of this evidence as the quoted portions of the email relay statements of a third-party DIRECTV customer made during a conversation between the customer and Mr. Escobar and thus constitute inadmissible hearsay.

60.     On the same date, June 5, 2014, Ms. Montmorency e-mailed Ms. Haley by separate cover, stating:  "Quick question for you... Fredy from Telecel now wants to engage more in commercial and wants to have one of his call center reps do some outbound calling.  Is there a specific agreement he has to sign for this? Kimmy mentioned that there was an agreement but that it varied by dealer? Can you walk me through this please?" (Ex. 13 at DTV0002156).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

61.     On the same date, June 5, 2014, Ms. Montmorency responded to Mr. Escobar's e-mail, stating that she "will look into this immediately and get back to you with a dealer explanation and solution" and that she would "schedule a call on Monday with us and the dealer to discuss[.]" (Ex. 14 at DTV0005981; Ex. 15 at DTV00002091).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

62.    Telecel managed very few commercial activations, including just two during the entire first quarter of 2014 and just 2 commercial activations in April 2016.  (Ex. 23 at DTV0013472; Ex. 49 at DTV0000830).

**RESPONSE:**

DIRECTV objects on the grounds that this fact is not material to the motion.

63.    Five days later, on June 10, 2014, Ms. Montmorency e-mailed Mr. Girgis stating that "I strongly suggest that we give him [Telecel's owner] a slap on the wrist this time," that Telecel "has been a very valuable partner with us since 2003," that Telecel "is one of our key dealers for EE in the North East," and that "if we charge him back for these 21 activations, we will lose his business." (Ex. 16 at DTV0015420-21).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence to the extent it implies that Ms. Montmorency's email was related to the hearsay reports of "cold calls" discussed in Paragraph 59.  To the contrary, the cited email indicates that the issues related to the submission of customer information when opening accounts where it was difficult for Telecel to verify information given its

primary marketing amongst English as a second language and immigrant communities. Moreover, Mr. Diaz had fired the responsible employee and DIRECTV determined that "none of what might appear to be fraud is intentional from the dealer side." (Exhibit 16 at DTV0015420).

64.    Mr. Girgis forwarded Ms. Montmorency's e-mail to others at DIRECTV, stating that if they charge Telecel back "we feel our business will drop drastically and the emphasis he was putting on commercial and residential will disappear." (Ex. 16 at DTV0015420).

**RESPONSE:**

DIRECTV incorporates its objections regarding the misleading context of the quotation used by Plaintiff in the statement from Paragraph 64.

65.    On June 18, 2014, Mr. Escobar followed up with Mr. Girgis stating, among other things, that "[p]er our conversation this morning, our primary concerns are that the dealer is intentionally cold calling and/or targeting existing DIRECTV subs . . ." (Ex. 17 at DTV0006028).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence as the email also lists "[s]coring applicants using varying pieces of information to get them approved without a fee" and "ignoring notice of cancellation emails and

recreating orders for applicants who have been flagged" as "primary concerns." (Ex. 17 at DTV0006028).

66.    On June 30, 2014, Mr. Girgis e-mailed Telecel stating, among other things, that Telecel needs to "discontinue all cold calling sales tactics " but letting Telecel know that "we appreciate your relationship and look forward to working together in the future." (Ex. 18 at 0001013).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

67.    The email communications between Mr. Escobar, Ms. Montmorency, and Mr. Girgis show that, as of June 2014, DIRECTV knew that Telecel engaged in cold-calling.  (Exs. 12-18).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence cited, as the evidence shows only that DIRECTV had received a single hearsay report of Telecel calling a pre-existing DIRECTV, not that DIRECTV knew that Telecel had engaged in a pattern of cold-calling.

68.     Prior to this litigation, Telecel never maintained an internal do-not-call list nor any procedures for scrubbing against the national do-not-call registry. (Diaz Dep. (Ex. 2) at 113:17-6, 132:7-9).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

69.     Prior to this litigation, DIRECTV never asked Telecel if it maintained an internal do-not-call list or whether it scrubbed against the national do-not-call registry.  (Diaz Dep. (Ex. 2) at 111:15-112:25).  Nor had DIRECTV ever inspected or audited Telecel's records to see if Telecel was maintaining an internal do-not-call list.  (Diaz Dep. (Ex. 2) at 112:22-25, 202:7-22).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  Mr. Diaz testified that DIRECTV would send regular messages to Telecel reminding it of the do-not-call procedures, but that it never asked any more specific questions beyond these "general reminders".   (Diaz Dep. (Ex. 2) at 111:15-112:25).

70.     When Telecel was asked whether, "[i]f DIRECTV had required you to maintain an internal do-not-call list, would you have done so?", Telecel initially

answered "Well, I – yes, I mean –." (Diaz Dep. (Ex. 2) at 115:7-10).  After

objections by DIRECTV's counsel, Telecel changed its answer to "I will maintain

my same procedures as I'm doing today." (Diaz Dep. (Ex. 2) at 115:7-116:9).

**RESPONSE:**

DIRECTV objects on the ground that this statement is not supported by the

evidence cited. Plaintiff quotes five words from Telecel's answer out of context,

when the complete exchange makes clear Telecel's answer was no, and Telecel did

not change that answer.

71.    In practice, Telecel did begin to maintain an internal do-not-call list,

as well as national do-not-call registry procedures, when DIRECTV "required" it

to do so after this litigation began.  "As a result of information learned in this

lawsuit, DIRECTV required that Telecel confirm that it has adopted and

implemented do-not-call policies and procedures . . ." (DIRECTV SOUF ¶ 40;

Telecel's Do Not Call Policies and Procedures (Ex. 11)).

**RESPONSE:**

DIRECTV objects that the evidence does not support Plaintiff's assertion.

DIRECTV's contracts always required Telecel to adhere to do-not-call

requirements. Haley Decl. Ex. D (Marketing Guidelines) at I(E)-(F) (Doc # 108-4).

72.     Ms. Montmorency testified that she could not "recall" whether she has ever personally asked if Telecel maintains an internal do-not-call list, nor whether she had ever seen, or if Telecel kept, such a list.  (Montmorency Dep. (Ex. 3) at 70:6-17, 71:25-72:4).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

73.     There is no evidence DIRECTV actually received, or required that Telecel submit, the documents required by the CDA regarding do-not-call restrictions.  Instead, DIRECTV claims only that "before doing business with Telecel [DIRECTV] required it to accept its marketing guidelines . . ." and that "Telecel was expected to run its business in conformance with the contractual promises it had made to DIRECTV, as embodied in the marketing guidelines." (DIRECTV Interrogatory (Ex. 7) Nos. 9, 16, 18).  It is just "assumed that they're conducting everything by our guidelines." (Montmorency Dep. (Ex. 3) at 132:5-133:9).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  The CDA does not, in itself, provide authorization for a retailer

to conduct even commercial telemarketing but rather sets forth the steps that such a retailer must take prior to receiving authorization.   There is no evidence in the record that Telecel ever received such authorization from DIRECTV.  Thus, there are no documents that Telecel was "required" to submit under the CDA. DIRECTV admits that the Court can properly consider the reminder of this evidence for the purposes of the motion.

74.    There is no evidence DIRECTV actually received, or required that Telecel submit, proof that Telecel would only cold-call commercial prospects by excluding residential consumers from its call list.  Haley Decl. Ex. C (CDA) (Doc # 108-3) at DTV000058.  In fact, DIRECTV knew that Telecel initiated cold-calls to residential consumers and sold residential DIRECTV programming packages to commercial prospects.  (Ex. 17 at DTV0006028; Ex. 24).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  The CDA does not, in itself, provide authorization for a retailer to conduct even commercial telemarketing but rather sets forth the steps that such a retailer must take prior to receiving authorization.   There is no evidence in the record that Telecel ever received such authorization from DIRECTV.  Thus, there are no documents that Telecel was "required" to submit under the CDA.

Moreover, the evidence cited does not show that Telecel regularly initiated cold calls to residential consumers.  Rather, it shows that DIRECTV received a single report of calls made by Telecel to a current DIRECTV subscriber.  Additionally, as described in DIRECTV's response to the fact in Paragraph 59 above, the evidence cited is inadmissible hearsay to the extent it recounts statements from the third-party DIRECTV customer about the nature of the calls he received.

75.     When asked to identify all facts supporting its defense that "DIRECTV established and implemented with due care, reasonable practices and procedures to effectively prevent" violations of the TCPA's do-not-call restrictions, DIRECTV denied that it had any "duty to ensure that its independent contractor, Telecel, had adequate do-not-call procedures in place" "under the TCPA or otherwise." (DIRECTV Interrogatory (Ex. 7) No. 9).  DIRECTV indicated only that it required Telecel "to accept its marketing guidelines as a condition of its contractual relationship." (DIRECTV Interrogatory (Ex. 7) No. 9).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

76.     To the extent DIRECTV defends or justifies its failure to conduct a due diligence investigation into Telecel prior to entering the CDA, it does so on the

basis of the claim that Telecel is not an authorized telemarketer, nor has it ever been authorized by DIRECTV to telemarket.  (DIRECTV's SOUF ¶¶ 3, 16).[4]

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  DIRECTV not only contends that Telecel was not an authorized telemarketer and had not been authorized by DIRECTV telemarket prior to entering the CDA, it contends that Telecel was *never* authorized to conduct telemarketing.

77.    DIRECTV never penalized Telecel for its calling practices.  (Diaz Dep. (Ex. 2) at 202:25-203:8).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.  Mr. Diaz testified only that, as of the time of his deposition, DIRECTV had never placed Telecel on a vendor block or withheld payment as a result of his calling practices.  Mr. Diaz did not testify regarding any other forms of penalties.

78.    Typically, when a dealer is found to be cold-calling, DIRECTV is "going to try to see if there's any other – they're going to ask Fredy for call records

---

[4] "DIRECTV's SOUF" refers to Defendant DIRECTV, LLC's Statement of Undisputed Facts in Support of its Motion for Summary Judgment.

to see if he really did call, you know, cold call or not or if he had an existing relationship with this customer . . . they would research and they would say that he is cold calling, it is up to our Legal team to terminate . . ." (Montmorency Dep. (Ex. 3) at 167:2-25).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

79.    There is no evidence DIRECTV undertook such an investigation in June 2014 after it discovered Telecel to be cold-calling.

**RESPONSE:**

DIRECTV objects to the statement on the grounds that it mischaracterizes the evidence cited.  Indeed, the emails cited by Plaintiff (at Exhibits 12-18) show an investigation into the single hearsay report of cold calling that DIRECTV received.

80.    In regard to what actions Ms. Montmorency took in response to the e-mail chain concerning Telecel "intentionally cold-calling," Ms. Montmorency testified that "I never reached out to anybody.  I never called – whatever his name was, Robert Arevalo, what his name was.  I never did any of that." (Montmorency Dep. (Ex. 3) at 166:15-22).  Ms. Montmorency further testified that her "job is not

to police Telecel" and she "did not do anything to see if they were doing an outbound call." (Montmorency Dep. (Ex. 3) at 168:2-17).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it mischaracterizes the evidence cited.   Although Ms. Montmorency did testify as to the statements contained in the paragraph, she further testified that the reason for this is that other individuals at DIRECTV (most notably its Legal department) would have responsibility to conduct any investigation.   Montmorency Dep. (Ex. 3) at 166:2-14.

### **DIRECTV's Policing of Other Telecel Violations**

81.   DIRECTV's fraud management unit, synonymously referred to as its account verifications or department of investigations unit, "periodically" reviews Telecel's business practices.  (Montmorency Dep. (Ex. 3) at 98:23-99:5, 111:17-112:8).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

82.   DIRECTV was also aware that Telecel was cold-calling because it knew that Telecel consistently "flipped" customers, a practice that it monitored

closely.  Flipping includes activations where a person is already a DIRECTV customer signed up by one authorized dealer and are then resold DIRECTV by another authorized dealer.  (Montmorency Dep. (Ex. 3) at 170:9-21).  *I.e.*, flipping is when one dealer activates a new subscription for a customer who is an existing DIRECTV customer sold by another dealer.

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it cites no evidence in support of its statements that Telecel "consistently flipped customers," or that flipping customers is the result of cold-calling as opposed to other marketing practices (such as an existing customer responding to a Telecel ad).  For the same reasons, DIRECTV objects to this statement on the grounds that it is not material to the motion, and because calls made to DIRECTV customers do not violate the do-not-call provisions of the TCPA since such individuals have an established business relationship with DIRECTV.

83.    For instance, on June 3, 2014, an internal DIRECTV e-mail to Mr. Escobar states that an "account holder is calling in stating that a dealer name [sic] Telecel has been calling them advising them they can give them a better deal and setting him up with new receivers . . ." (Ex. 26 at DTV0000201).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that the evidence cited is inadmissible hearsay, since it recounts the statements of a third-party DIRECTV account holder.  DIRECTV further objects to this statement on the grounds that it is not material to the motion, as calls made to DIRECTV customers do not violate the do-not-call provisions of the TCPA since such individuals have an established business relationship with DIRECTV.

84.    On June 10, 2013, Mr. Escobar e-mailed that Telecel had flipped three particular accounts.  (Ex. 27 at DTV0000385).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

85.    On June 5, 2014, Mr. Escobar e-mailed that, from April 1, 2014, to May 31, 2014, alone, Telecel flipped 12 accounts from other dealers.  (Ex. 27 at DTV0000379).  In the same message, Mr. Escobar stated that a current customer "stated he received a call from a woman offering a lower rate and new equipment if his wife signed up for new service." (Ex. 27 at DTV0000379).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion. Furthermore, the portion of the statement that cites to Mr. Escobar

relaying a statement from a customer is inadmissible third-party hearsay and

DIRECTV objects on those grounds.

86.    On March 25, 2015, another DIRECTV employee in the account

verification group, Mr. Ramon Cruz, e-mailed that between January 1, 2015, and

February 28, 2015, there were "22 accounts that were created [by Telecel] for

existing/ineligible households." (Ex. 27 at DTV0000376).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to

the motion.

87.    On September 1, 2015, another DIRECTV employee, Ms. Alexandra

Macneill, e-mailed that another existing DIRECTV customer activated by a dealer

other than Telecel stated "that he was receiving calls from Spanish speaking

DIRECTV representatives . . ." (Ex. 28 at DTV0002066).  In the same message,

Ms. Macneill confirmed that Telecel had flipped three accounts from another

dealer:  "From the accounts identified, three accounts were disconnected and

flipped from General Markets to Telecel." (Ex. 28 at DTV0002067).

**RESPONSE:**

DIRECTV objects to the portion of the statement that cites to Mr. Escobar

relaying a statement from a customer, as such statements are inadmissible third-

party hearsay.  DIRECTV objects to this statement on the grounds that it is not material to the motion.

88.     DIRECTV knew of many individual instances in which Telecel had sold a new subscription to an existing DIRECTV customer.  Attached hereto as composite Exhibit 29 are one hundred twenty-three examples evidencing DIRECTV's knowledge of individual instances of flipping by Telcel.  Each such instance expressly provides that the sale will not be completed because the customer already has an existing account.  (Ex. 29).

**<u>RESPONSE:</u>**

DIRECTV objects to this statement on the grounds that it is not material to the motion.  Moreover, the statement mischaracterizes the evidence cited.  The examples are instances where Telecel attempted to secure service for a person that turned out to already have DIRECTV service, but they do not indicate that another dealer, as opposed to DIRECTV, had signed these persons up (*i.e.*, what Plaintiff has defined as "flipping"). In addition, many of the accounts in the composite email were ineligible not because they were already customers, but because they were customers whose prior account had a high outstanding balance.

89.     Consumer complaints are routed to DIRECTV's "dealer escalations." (*See, e.g.*, Ex. 53).  As an example, dealer escalations emailed Telecel regarding a

consumer complaint where Telecel's caller "was very rude and told customer he will send customer to court if he cancels." (Ex. 51 at DTV0001453).  As part of the process, DIRECTV exerts its control over Telecel, stating:  "you as the original dealer will be required to resolve these immediately.  You are required to respond back to this email chain within 24 business hours with your findings and resolution regarding this order as well as what steps you will be taking to prevent this from occurring in the future." (*Id.*).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion, but DIRECTV objects to Plaintiff's characterization of the email as DIRECTV "exert[ing] its control over Telecel."

90.     On June 10, 2013, DIRECTV employee Manuel Escobar e-mailed that "Telecel Marketing made its third appearance on our fraud report . . . Dealer is manipulating names and addresses at point of sale (data attached, see OSCAR tab, trouble areas highlighted). . . . Dealer is also using the same credit cards on more than one account.  Please address these issues with the dealer and let us know what their response is." (Ex. 27 at DTV0000385).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

91.    DIRECTV's then area sales manager responded, stating that Telecel "has identified the issue" and has "removed order entry access to everyone, except 2 managers and these individuals will be held accountable.  Also, they have held a training to review the correct process for order entries. . . . The owner has asked if we can pull another report in 2 weeks, to help him ensure that everyone is following the new guidelines." (Ex. 27 at DTV0000384).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

92.    On March 3, 2014, Mr. Escobar e-mailed again that Telecel "popped up on our report that monitors the credit scoring tool.  They're once again making multiple scoring attempts using more than one address and/or using several name combinations. . . . Could you please address these issues with the dealer and let us know what their explanation is?" (Ex. 27 at DTV0000381-82).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

93.     In response, DIRECTV's area sales manager then in charge of Telecel stated that he "met with the owner and manager last Wednesday.  They had slipped back into letting some of the sales reps enter their own orders . . . They have pulled order entry back to only managers. . . . They had a full training on Friday with all of their reps . . . We should not see this again.  I will follow up with you at the end of the month and ask that you run another report, so I can confirm they are following the new policy." (Ex. 27 at DTV0000380).

**<u>RESPONSE:</u>**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

94.     On June 18, 2014, Mr. Escobar e-mailed Mr. Girgis, stating, among other things, that "[p]er our conversation this morning, our primary concerns are that the dealer is intentionally [1] Cold calling and/or targeting existing DIRECTV subs[,] [2] Scoring applicants using varying pieces of information to get them approved without a fee (name and address)[,] [3] Ignoring Notice of Cancellation emails and recreating orders for applicants who have been flagged[.]" (Ex. 27 at DTV0000378).  He further outlined actions for which DIRECTV needs "some assurances from the dealer before we waive the special chargeback on the 21 accounts." (Ex. 27 at DTV0000378).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

95.     On July 30, 2014, DIRECTV followed up, stating that "the dealer has shown improvements in areas such as flipping.  However, there are some areas that still need attention. . . . Our research indicates that the dealer has continued to recreate accounts after the original accounts are flagged by our Verification Team, credit score individuals at several addresses and manipulate email addresses at point of sale. . . . <u>as promised we will continue to monitor the dealer</u>." (Ex. 27 at DTV0000377) (emphasis added).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

96.     On July 31, 2014, DIRECTV communicated its findings from monitoring Telecel's point-of-sale practices directly to Telecel, stating:  "the Risk Management team has seen a lot of improvements but there are still a few things that need to be fixed on the backend.  Our research indicates the following things that need to be addressed:  [1] Recreating accounts after the original accounts are flagged by our Verification Team (Install Postponement Emails); [2] Credit

scoring individuals at several addresses (with different last names as well etc); [3] Manipulating email addresses at point of sale (Same emails keep coming up)." (Ex. 50 at DTV0001040).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

97.    On March 25, 2015, DIRECTV followed up again in its monitoring of Telecel, stating that it "identified several issues that need to be addresses related to credit scoring manipulation, recreation of accounts after they are initially stopped by our Account Verification Team, and the creation of new accounts for existing customer/households.  These are all issues which have been previously addressed with the dealer twice before." (Ex. 27 at DTV0000376).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

98.    Telecel terminated at least one other employee following DIRECTV's monitoring of Telecel's business practices.  (Ex. 44 at DTV0002100).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

99.     With respect to the issues monitored by DIRECTV and identified in Ex. 27 at DTV0000376-85, Ms. Montmorency testified they are "something that I do deal with on an everyday basis with every single one of my dealers." (Montmorency Dep. (Ex. 3) at 169:13-21).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

100.   With respect to the issues monitored by DIRECTV and identified in Ex. 27 at DTV0000376-85, Telecel testified that there is a constant level of interaction and oversight by DIRECTV that results in ongoing conversations regarding point of sale practices.  (Diaz Dep. (Ex. 2) at 169:17-170:17).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the testimony as nothing in Mr. Diaz's testimony indicates that DIRECTV oversees or controls Telecel's actions regarding its point of sales practices.  Rather, Mr. Diaz testified that he would have conversations with DIRECTV and that it would send him information.

## Facts Relating to Plaintiff Cordoba

101.   Plaintiff began receiving unsolicited telephone solicitations from Telecel on behalf of DIRECTV on July 31, 2014.  (Cordoba Decl. (Ex. 19) at ¶ 8).

**RESPONSE:**

DIRECTV objects to the characterization of the evidence as showing that Telecel's unauthorized alleged solicitations were made "on behalf of DIRECTV" but otherwise admits that the Court can properly consider this evidence for the purposes of the motion.

102.   Plaintiff registered his phone number on the national do-not-call registry on December 12, 2014.  (Cordoba Decl. (Ex. 19) at ¶ 13).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

103.   Plaintiff received a total of twenty-six telephone solicitations for DIRECTV services between July 31, 2014, and November 4, 2015.  (Cordoba Decl. (Ex. 19) at ¶¶ 8, 22).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

104.    Nineteen of those twenty-six calls were made after Plaintiff registered his number on the national do-not-call registry.  (Cordoba Decl. (Ex. 19) ¶¶ 14, 20).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

105.    Plaintiff advised DIRECTV and Telecel orally on several occasions, and DIRECTV in writing in December 2014 and January 2015, that he was receiving these unwanted telephone solicitations and wished them to stop. (Cordoba Decl. (Ex. 19) ¶¶ 10-21, Exs. 1-2; Cordoba Dep. (Ex. 20) at 66:16-25).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

106.    DIRECTV never advised Telecel of Plaintiff's complaints nor told Telecel to stop calling him.  (Diaz Dep. (Ex. 2) at 108:15-17, 109:9-110:17).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

107.   Telecel regularly represented to Plaintiff that it was calling directly from DIRECTV.  As Plaintiff testified, "when [Plaintiff] received [these marketing] calls [from Telecel], [he] asked on several occasions if the representative on the line was directly affiliated with DIRECTV or if they were affiliated with a third party of some sort.  The response that they gave always was that they were directly affiliated with DIRECTV.  So, based on that information, [he] was always led to believe that [he] was speaking directly with DIRECTV about whatever issue was at hand.  Second, on a number of occasions, when [Plaintiff] asked to not be called . . . [he] was transferred to what [he] was told was a DIRECTV Call Center." (Cordoba Dep. (Ex. 20) at 49:6-23; *see also id.* at 63:22-64:9 (Telecel "always represented themselves as being directly affiliated with DIRECTV")).

**RESPONSE:**

DIRECTV admits that the Court can properly consider this evidence for the purposes of the motion.

108.   DIRECTV was aware of Telecel's practice of identifying itself as DIRECTV.  (Ex. 28 at DTV0002066; Ex. 43 at DTV0002928 (stating that, during investigation into problem practices by Telecel including cold-calling, DIRECTV discovered that Telecel was making calls "claiming to be DIRECTV

representatives" and answered its phones by stating "thank you for calling DIRECTV, how may I help you?")).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence as there is no indication in the evidence cited that DIRECTV understood that Telecel's reference to themselves as DIRECTV was an ongoing or consistent issue. For example, Ex. 24 at DTV0006026 indicates that a meeting with the sales group occurred to "make sure this does not happen again".

109.   DIRECTV was aware of Telecel's practice of transferring consumers to DIRECTV's customer care call center.  (Ex. 28 at DTV0002065 (stating Telecel representatives "are No Longer allowed to transfer any of our clients to Directv customer care")).

**RESPONSE:**

DIRECTV objects to this statement as mischaracterizing the evidence as there is no indication in the evidence cited that DIRECTV understood that Telecel's transfer of customers to DIRECTV's customer care was an ongoing or consistent issue.  For example, Ex. 28 indicates that Telecel was "No Longer allowed" to transfer any individuals to DIRECTV customer care.

**<u>Telecel's Call Data</u>**

110.   Telecel attached as Exhibit P to its Business Records Certification and Affidavit a list of inbound calls to its 1-800 number for the period November 2, 2015, through April 4, 2016.  (Telecel Affidavit (Ex. 47) at ¶ 18, Ex. P).

**<u>RESPONSE:</u>**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

111.   Exhibit P of the Telecel Affidavit contains a total of 1,982 unique telephone numbers that dialed into the 1-800 number.  (Wilson Decl. (Ex. 48) at ¶ 4).

**<u>RESPONSE:</u>**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

112.   Telecel attached as Exhibit A to its Business Records Certification and Affidavit a list of outbound calls it made to sell DIRECTV for the period March 27, 2015, to March 3, 2016.  (Telecel Affidavit (Ex. 47) at ¶ 3, Ex. A).

**<u>RESPONSE:</u>**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

113.   Exhibit A of the Telecel Affidavit contains a total of 24,566 unique telephone numbers, of which there are 16,870 unique telephone numbers to which Telecel made more than one outbound call.  (Wilson Decl. (Ex. 48) at ¶ 3).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

114.   According to Telecel, there should be a "substantial amount of overlap" between the outbound data and the inbound data to the 1-800 number. (Diaz Dep. (Ex. 2) at 182:15-22).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

115.   However, when compared to 16,870 unique telephone numbers to which Telecel made at least two phone calls in Exhibit A, there are just seven overlapping numbers contained in the 1,982 unique telephone numbers contained in Exhibit P.  (Wilson Decl. (Ex. 48) at ¶¶ 2-7).

**RESPONSE:**

DIRECTV objects to this statement on the grounds that it is not material to the motion.

Respectfully submitted,

Dated:  January 19, 2018      /s/  Hans J. Germann


Kara Ong                     John E. Muench
AT&T SERVICES, INC.       Hans J. Germann
675 W. Peachtree St. NW,    Kyle J. Steinmetz
Suite 4300              MAYER BROWN, LLP
Atlanta, GA 30308        71 S. Wacker Drive
ko4639@att.com          Chicago, IL 60606
jmuench@mayerbrown.com
hgermann@mayerbrown.com
ksteinmetz@mayerbrown.com

John P. Jett
Georgia Bar No. 827033
Ava J. Conger
Georgia Bar No. 676247
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
jjett@kilpatricktownsend.com
aconger@kilpatricktownsend.com

## Certificate of Compliance

I hereby certify, pursuant to Local Rules 5.1.C and 7.1.D of the Northern District of Georgia, that the foregoing was prepared in 14-point Times New Roman font.

This 19th day of January, 2018         /s/   Hans J. Germann

## Certificate of Service

This is to certify that I have this day electronically filed the foregoing **DEFENDANT DIRECTV, LLC'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT** via the CM/ECF system, which will automatically send email notification to the attorneys of record.

This 19th day of  January, 2018         /s/   Hans J. Germann