## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**SEBASTIAN CORDOBA,**
**individually and on behalf of all**
**others similarly situated, and RENE**
**ROMERO, individually and behalf of**
**all others similarly situated,**

**Plaintiffs,**

**v.**

**DIRECTV, LLC, individually and as**
**successor through merger to**
**DIRECTV, Inc.,**

**Defendant.**

**CIVIL ACTION FILE**

**NO. 1:15-CV-3755-MHC**

## ORDER

This matter comes before the Court on Defendant DIRECTV, LLC

("DIRECTV")'s Motion for Summary Judgment [Doc. 204].

## I.      INTRODUCTION

Plaintiff Sebastian Cordoba ("Cordoba") brings this class action lawsuit, as

well as his own individual claim, against DIRECTV for, in pertinent part,

violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227,

and related rules and regulations promulgated by the Federal Communications

Commission ("FCC"), 47 C.F.R. § 64.1200.  Third Am. Class Action Compl. ("Third Am. Compl.") [Doc. 143] ¶ 2.  According to the allegations in the Third Amended Complaint, beginning in or around 2003, DIRECTV engaged Telecel Marketing Solutions, Inc. ("Telecel")—which operates call centers in El Salvador and Maryland—to market DIRECTV's products and services by telephone.  Third Am. Compl. ¶ 4, Tr. Dep. of Fredy Diaz (Sept. 21, 2016) ("Diaz Dep.") [Doc. 112] at 15, 76.  Cordoba alleges that Telecel placed 60,506 telephone calls to 24,566 unique telephone numbers for the purpose of selling or encouraging the sale of DIRECTV products or services, pursuant to a contract between DIRECTV and Telecel.  Third Am. Compl. ¶ 48.

Cordoba alleges that, at all times relevant to this lawsuit, Telecel did not institute the mandatory minimum procedures required by 47 C.F.R. § 64.1200(d)—specifically, that Telecel (1) did not keep an internal do-not-call list; (2) did not maintain a written policy for maintaining an internal do-not-call list; (3) did not train its employees with respect to the existence of, or adherence to, an internal do-not-call list; (4) did not record requests not to be called; and (5) neither adhered to requests not to be called nor "scrubbed" these requests against a list of persons who requested not to be called prior to initiating contact with consumers.[1]  Id. ¶¶ 5,

---

[1] The minimum required procedures include maintaining a do-not-call list,

50-54.  Cordoba alleges that between March 27, 2015, and March 3, 2016, Telecel

(1) initiated at least two calls to 16,890 persons without instituting the mandatory

minimum procedures required by 47 C.F.R. § 64.1200(d), and (2) initiated at least

two calls to 926 persons on the National Do Not Call Registry (the "Cold Calls").

Id. ¶¶ 58-59.  Cordoba alleges that DIRECTV was aware that Telecel was placing

these calls, Telecel made each call within the scope of its actual and apparent

authority from DIRECTV, and DIRECTV ratified Telecel's marketing activities

including each call that is the subject of this action.  Id. ¶¶ 55-57.

## II.   FACTUAL BACKGROUND[2]

---

recording requests from residential telephone subscribers to be added to the do-not-call list, and educating employees about the existence and use of the do-not-call list.  47 C.F.R. § 64.1200(d).

[2] The Court views the evidence presented by the parties in the light most favorable to the non-movants and has drawn all justifiable inferences in favor of the non-movants.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1270 (11th Cir. 2013).  In addition, the Court has excluded assertions of facts that are immaterial or presented as arguments or legal conclusions or any fact not supported by citation to evidence (including page or paragraph number). LR 56.1B(1), NDGa.  Further, the Court accepts as admitted those facts in the parties' respective statements of material facts that have not been specifically controverted with citation to the relevant portions of the record. LR 56.1B(2)(a)(2), NDGa; see Def.'s Statement of Undisputed Facts in Support of its Mot. for Summ J. ("Def.'s SOUF") [Doc. 204-2]; Pl.'s Resp. to Def.'s Statement of Undisputed Facts in Support of its Mot. for Summ J. ("Pl.'s Resp. to Def.'s SOUF") [Doc. 216-1]; Pl.'s Statement of Additional Facts Precluding Summ J. ("Pl.'s Add'l Facts") [Doc. 216-2]; Def.'s Resp. to Pl.'s Statement of

## A.    The Relationship Between DIRECTV and Telecel

DIRECTV, a provider of direct satellite entertainment services to a nationwide customer base, engages in various types of marketing including the use of authorized telemarketers and retail partners that solicit DIRECTV subscriptions. Def.'s SOUF ¶¶ 1, 2, 4; Pl.'s Resp. to Def.'s SOUF ¶¶ 1, 2, 4.  Telecel has been DIRECTV's retail partner since approximately 2003.  Def.'s SOUF ¶ 8; Pl.'s Resp. to Def.'s SOUF ¶ 8.

At the time of the calls in question, DIRECTV and Telecel's relationship was governed by an Independent Retailer Agreement ("IRA") [Doc. 205-1], a Customer Referral Agreement ("CRA") [Doc. 205-2], and a Commercial Dealer Agreement ("CDA") [Doc. 205-3] (collectively, the "Contracts").  Def.'s SOUF ¶ 11; Pl.'s Resp. to Def.'s SOUF ¶ 11.  The Contracts provide that Telecel is an independent contractor who is engaged to market, promote, and advertise the lease of DIRECTV systems and the sale of DIRECTV subscriptions; Telecel is paid a commission after a customer activates service but that amount is subject to a "chargeback" if the customer later disconnects or cancels service.  IRA §§ 1.1, 6.6, 15 & Ex. D; CRA §§ 1.1, 5.5, 5.6, 14 & Ex. C; CDA §§ 1.2, 6.2, 6.4, 8-9, 15 &

---

Additional Facts Precluding Summ J. ("Def.'s Resp. to Pl.'s Add'l Facts") [Doc. 224-1].

4

Sched. 6.4.  Telecel was required to "comply with the standard policies and procedures DIRECTV may promulgate for its retailers in written notices, guidelines, and bulletins, including . . . the telemarketing policy  . . . as they may be amended from time to time[.]"  IRA § 2.6; see also CRA § 2.6; CDA § 2.6.  The CDA includes a "TELEMARKETING POLICY" which is subtitled "DIRECTV POLICY FOR COMMERCIAL ACCOUNT TELEMARKETING" and provides guidelines for "live operator" telemarketing calls to businesses.  CDA, Sched. 2.6.  In that same section, the CDA states, "Commercial retailers must take care to assembly call lists that contain *only land-line Business telephone numbers*.  Calls to residential telephone lines or cellular phones are not permitted."  Id.

Retailers such as Telecel also receive a "Direct Policy Statement" from DIRECTV which has a cover letter with the following statement:  "**Reminder:** It is a violation of DIRECTV's policy for its retailers to perform any outbound telemarketing unless they are returning a direct inquiry from a customer and such inquiry can be substantiated; review the following Policy Statement for all restrictions."  Cover Letter, DIRECTV Policy Statement [Doc. 205-4] at 1.  The Policy Statement specifically prohibits pre-recorded message or text advertising using DIRECTV branded products or services, or using live operators to place unsolicited cold calls.  Id. at 3-4.

Telecel employs about ten people that sell products, including through a call center in El Salvador.  Diaz Dep. at 14-15.  Telecel's marketing includes radio and television advertising as well as telemarketing through advertisements which feature DIRECTV offers that provide a toll-free number that routes potential customers to Telecel's call center.  Id. at 13, 17-21; Pl.'s Add'l Facts ¶ 16; Def.'s Resp. to Pl.'s Add'l Facts ¶ 16.  DIRECTV did not provide telephone numbers or specific leads to Telecel.  Diaz Dep. at 30; Def.'s SOUF ¶ 28; Pl.'s Resp. to Def.'s SOUF ¶ 28.  Telecel developed their call list from information collected from existing customers and from those who called into the toll-free phone number. Diaz Dep. at 38-40.

## B.   DIRECTV's Knowledge of Cold Calls Made by Telecel

Cordoba received a number of Cold Calls from Telecel marketing DIRECTV subscriptions, and he contacted DIRECTV in an effort to stop the calls. Decl. of Sebastian Cordoba ("Cordoba Decl.") [Doc. 125-19] ¶¶ 8-17, 19-22. When Cordoba contacted DIRECTV and asked to be placed on a do-not-call list, DIRECTV stated, and Cordoba understood, that DIRECTV's placement of him on a do-not-call list did not extend to independently operating retailers such as Telecel.  Def.'s SOUF ¶ 38; Pl.'s Resp. to Def.'s SOUF ¶ 38.

In support of his allegation that DIRECTV was aware that Telecel had a

practice of making Cold Calls, Cordoba cites to several internal DIRECTV emails

in June 2014.  Pl.'s Add'l Facts ¶¶ 59, 63-67.  One of these emails cited by

Cordoba refers to a single "existing DIRECTV customer" receiving "cold calls"

from Telecel.  Email from Manuel Escobar to Sasha Labrada (June 5, 2014, 2:19

PM) [Doc. 218-9 at 2-3].  The email stated:

> An existing DIRECTV customer called our Account Verification
> Department stating that Telecel Marketing contacted him about
> opening a new account.  He stated he's received multiple calls from
> Roberto Arevalo from 2 different phone numbers: [a number ending in]
> 9284 and [a number ending in] 9057.  These were cold calls since the
> customer hadn't inquired about new service. Phone number [ending in]
> 9284 has also been calling Customer Care to disconnect service on
> existing DIRECTV accounts.  I spoke with a customer whose new
> Telecel order was still pending . . . .  He stated he received a call from
> a woman offering a lower rate and new equipment if his wife signed up
> for new service.  The address on the new Telecel order doesn't match
> the customer's actual residence.  I spoke with another customer whose
> account was activated . . . she verified the address on the disconnected
> account as her residence.  From April 1 through May 31, 177 accounts
> were activated-21 were for existing subs (11%), with 9 of the 21 coming
> from the dealer's own base.  Phone number [ending in] 9284 called to
> Customer Care to disconnect 8 accounts.  These 21 flipped accounts
> make up a small percentage of the overall number of activations,
> however the dealer has been placing new orders in a relative's name
> and/or under a bogus address so there may be more that [I]'m not seeing
> yet.

Id.  When DIRECTV followed up on this issue, Telecel's owner "looked into these

cases and fired the sales person that was associated with some of these."  Email

from Sasha Labrada to Micky Girgis (June 10, 2014, 11:24 AM) [Doc. 218-10] at

2-3.  Several days later, a related email explained that DIRECTV wanted assurance

that Telecel would "[d]iscontinue all cold calling sales tactics[.]"  Email from

Manuel Escobar to Micky Girgis (June 18, 2014, 5:10 PM) [Doc. 218-11 at 2].

## III.    PROCEDURAL BACKGROUND

On July 12, 2017, the Court granted Cordoba's Motion for Class

Certification [Doc. 63], certifying two representative classes: the Internal Do Not

Call ("IDNC") Class and the National Do Not Call ("NDNC") Class.[3]  DIRECTV

petitioned the United States Court of Appeals for the Eleventh Circuit for

permission to appeal pursuant to Federal Rule of Civil Procedure 23(f).  See Order,

DIRECTV, LLC v. Cordoba, No. 17-90020-J (11th Cir. May 21, 2018) [Doc. 139].

The Eleventh Circuit granted DIRECTV permission to appeal certification of the

IDNC Class, as to the question of "[w]hether a recipient of a telemarketing call

who did not request to be placed on a caller's internal [do-not-call] list has

---

[3] The IDNC class was defined as "[a]ll persons within the United States who received more than one telephone call on or after October 27, 2011, from Telecel on behalf of DIRECTV for the purpose of selling or encouraging the sale of DIRECTV's goods and/or services[,]" and the NDNC class was defined as "[a]ll persons residing within the United States whose telephone numbers were on the National Do Not Call Registry, but who received more than one telephone call on or after October 27, 2011, from Telecel on behalf of DIRECTV for the purpose of selling or attempting to sell DIRECTV'S goods and/or services."  Cordoba v. DirecTV, LLC, 320 F.R.D. 582, 589, 603 (N.D. Ga. 2017), vacated in part, 942 F.3d 1259 (11th Cir. 2019).

standing under Article III to maintain a claim that the caller failed to institute appropriate internal [do-not-call] list procedures." Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1267 (11th Cir. 2019).

On November 15, 2019, the Eleventh Circuit vacated this Court's certification of the IDNC class. See id. at 1277. The Eleventh Circuit held that the recipients of calls made by Telecel "who never asked the telemarketer to stop calling them do not have standing to sue over violations of the internal do-not-call list regulations because their injuries are not fairly traceable to the telemarketer's failure to maintain an internal do-not-call list." Id. at 1276. The Eleventh Circuit then instructed this Court to consider under Rule 23(b)(3) whether the issue of individualized standing would predominate over common issues in the proposed class. Id. at 1276-77. The Eleventh Circuit's mandate was made the judgment of this Court on December 18, 2019. Dec. 18, 2019, Order [Doc. 180]. On January 31, 2020, Cordoba renewed his motion to certify the IDNC Class, Pl.'s Renewed Mot. for Class Certification [Doc. 183], which this Court denied without prejudice. July 23, 2020, Order [Doc. 201].

On August 24, 2020, DIRECTV filed its Motion for Summary Judgment now before the Court, seeking summary judgment on the certified NDNC class claims and Cordoba's individual IDNC claim, which are brought under Counts I

and II of the Third Amended Complaint.  Mot. for Summ. J.  As a result of this

Court's prior rulings, the Third Amended Complaint now has only two remaining

claims: (1) a claim that Defendants violated the TCPA and related regulations

made on behalf of the NDNC Class and (2) a claim that Defendants violated the

TCPA and related regulations made on behalf of Cordoba individually.[4]

## IV.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  A party seeking summary judgment has the burden of informing

the district court of the basis for its motion and identifying those portions of the

record which it believes demonstrate the absence of a genuine issue of material

fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions," and cannot be made by the district

---

[4] Count III of the Third Amended Complaint, in which Plaintiff Rene Romero alleges that DIRECTV disclosed personal identifiable information of subscribers in violation of the Satellite Television Extension and Localism Act of 2010 ("STELA"), 47 U.S.C. § 338(i)(4), must be resolved through arbitration.  See Third Am. Compl. ¶¶ 145-149; Cordoba v. DIRECTV, LLC, 801 F. App'x 723, 724-26 (11th Cir. 2020), rev'g 347 F. Supp. 3d 1311 (N.D. Ga. 2018) (holding that Romero's STELA claim is subject to arbitration); Apr. 1, 2020, Order [Doc. 190] at 1.

court in considering whether to grant summary judgment.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins.

Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

     If a movant meets its burden, the party opposing summary judgment must

present evidence demonstrating a genuine issue of material fact or that the movant

is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In

determining whether a genuine issue of material fact exists, the evidence is viewed

in the light most favorable to the party opposing summary judgment, "and all

justifiable inferences are to be drawn" in favor of that opposing party.  Anderson,

477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th

Cir. 1999).  A fact is "material" only if it can affect the outcome of the lawsuit

under the governing legal principles.  Anderson, 477 U.S. at 248.  A factual dispute

is "genuine" if the evidence would permit a reasonable jury to return a verdict for

the nonmoving party.  Anderson, 477 U.S. at 248.  "If the record presents factual

issues, the court must not decide them; it must deny the motion and proceed to

trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party," summary

judgment for the moving party is proper.  Matsushita, 475 U.S. at 587.

## V.   DISCUSSION

It is undisputed that the Cold Calls were not made by DIRECTV; instead, Cordoba alleges that DIRECTV is responsible for the Cold Calls made by Telecel "under agency principles of, *inter alia*, actual authority, apparent authority, and ratification."  Third Am. Compl. ¶ 16.  DIRECTV argues that it is entitled to summary judgment on the NDNC class claim and Cordoba's individual IDNC claim because DIRECTV cannot be held vicariously liable for Telecel's actions. Def.'s Mem. in Supp. of Its Mot. for Summ. J. ("Def.'s Mem.") [Doc. 204-1] at 1-2.  In particular, DIRECTV alleges that (1) the Cold Calls were outside of any actual authority that Telecel had to act on behalf of DIRECTV, (2) DIRECTV never made representations sufficient to give Telecel apparent authority to make the Cold Calls, and (3) DIRECTV never ratified the Cold Calls.[5]  Id.  In response,

---

[5] DIRECTV also asserts that Telecel could not be its agent because the agreements between them classify Telecel as an independent contractor.  Def.'s Mem. at 1, 5. The Court assumes without deciding that Telecel was DIRECTV's agent and proceeds with an analysis of whether authority existed, actual or apparent because, without such authority, the question of agency is irrelevant.  See McDermet v. DIRECTV, LLC, No. 19-11322-FDS, 2021 WL 217336, at *7 n.8 (D. Mass. Jan. 21, 2021) ("Defendants contend that the authorized retailers were prohibited from using those resources for telemarketing purposes.  Because the Court concludes that even if the authorized retailers were defendants' agents for other purposes, they lacked the actual authority to engage in telemarketing, it does not reach that question.").

Cordoba contends that Telecel had both actual and apparent authority to make the Cold Calls on behalf of DIRECTV and that DIRECTV ratified Telecel's actions. Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. 216] at 9.

### A. Whether Telecel Had Actual Authority to Make Cold Calls on Behalf of DIRECTV

DIRECTV argues that the Cold Calls made by Telecel were unauthorized and outside the scope of any authority Telecel had to act on behalf of DIRECTV. Def.'s Mem. at 19-22. "When applying agency principles to federal statutes, 'the Restatement [] of Agency . . . is a useful beginning point for a discussion of general agency principles.'" Ramos-Barrientos v. Bland, 661 F.3d 587, 600 (11th Cir. 2011) (quoting Burlington Indus. v. Ellerth, 524 U.S. 742, 755 (1998)). "Actual authority . . . is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." D & M Carriers LLC v. M/V Thor Spirit, 586 F. App'x 564, 570 (11th Cir. 2014) (quoting RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006)).

Authority vested in an agent can be either express or implied. RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006). To demonstrate that Telecel had express actual authority, Cordoba must plead facts regarding a verbal or written agreement between Telecel and DIRECTV creating that express agency. See

J'Carpc, LLC v. Wilkins, 545 F. Supp. 2d 1330, 1337 (N.D. Ga. 2008) (express

actual authority "arises in the situation where the principal expressly confers

authority on the agent to act on its behalf"); D. M. I. Dynamic Mgmt. Invs., B.V. v.

Konvict Muzik, LLC, No. l:10-cv-3510-TWT, 2011 WL 2119131, at *2 (N.D. Ga.

May 26, 2011) (to state a claim for express agency, plaintiff must identify an

agreement between principal and agent).  Implied authority—not to be confused

with apparent authority—is another form of actual authority that grants the agent

the ability "to do acts that are incidental to [the express authority conferred on the

agent], usually accompany it, or are reasonably necessary to accomplish it."  Bd. of

Trs. of City of Delray Beach Police & Firefighters Retirement Sys. v. Citigroup

Global Mkts., Inc., 622 F.3d 1335, 1342-43 (11th Cir. 2010).

Cordoba has failed to present evidence that demonstrates Telecel had actual

authority to make the Cold Calls to residential consumers on DIRECTV's behalf.

First, Cordoba points to no statement made by DIRECTV which could reasonably

be read as a direct order to make unsolicited Cold Calls to potential customers who

had not first contacted Telecel.  To the contrary, such conduct was expressly

prohibited under Telecel's contracts with DIRECTV.  Decl. of Sasha

Montmorency ("Montmorency Decl.") [Doc. 204-6] ¶ 11; Decl. of Kristin Haley

("Haley Decl.") [Doc. 204-4] ¶ 13-15; see also McDermet, 2021 WL 217336, at *7

14

(finding that alleged agent had no authority to conduct cold calls in violation of the TCPA when the relationship with the principal was governed by the same contractual language as was used in this case between DIRECTV and Telecel expressly prohibiting cold calls to potential customers).  Cordoba contends that Telecel was "expressly authorized to conduct outbound telemarketing, or cold-calling, on behalf of DIRECTV" pursuant to the CDA.  Def.'s Resp. to Pl.'s Add'l Facts ¶ 18.  However, the cited section of the CDA unambiguously states that telemarketing calls "to residential telephone lines or cellular phones are not permitted."  CDA, Sched. 2.6.

There also is no evidence indicating that Telecel had implied actual authority to make the Cold Calls.  In Bridgeview v. Health Care Ctr., Ltd. v. Clark, 816 F.3d 935 (7th Cir. 2016), the defendant hired a marketing company and gave explicit, limited instructions to conduct fax marketing, targeting local businesses within a twenty-mile radius.  Id. at 937-39.  The marketing company, however, went well beyond these instructions by sending thousands of faxes to businesses in neighboring states.  Id. at 939.  The Seventh Circuit held that the express authority to conduct some fax marketing could not be reasonably interpreted as permission to send faxes outside of the stated limits, even though the instructions were verbally given and the defendant never examined the list of numbers that the

marketer was using.  <u>Id.</u>  Similarly, in this case, DIRECTV gave Telecel explicit instructions limiting the type of marketing that Telecel could engage in on behalf of DIRECTV.  <u>See, e.g.</u>, CDA § 2.6 ("[Telecel] shall comply with the standard policies and procedures DIRECTV may promulgate for its dealers in notices, guidelines, and bulletins, including . . . the telemarketing policy . . . .").  Those instructions included an unambiguous prohibition from cold calling potential residential customers.  <u>See id.</u> at Sched. 2.6; <u>see also</u> Cover Letter, Policy Statement at 1 ("It is a violation of DIRECTV's policy for its retailers to perform any outbound telemarketing unless they are returning a direct inquiry from a customer and such inquiry can be substantiated . . . .").  Moreover, the cold call ban was not hidden deep within lengthy policy documents and couched in legal jargon; DIRECTV indicated its position on the topic on the cover letter for its telemarketing policy with a bold and underlined "**<u>Reminder</u>**."  Cover Letter, Policy Statement at 1.

Viewed in the light most favorable to Cordoba, there is no disputed issue of material fact as to whether DIRECTV implicitly authorized Telecel to make the Cold Calls.  The evidence before the Court establishes that DIRECTV categorically banned all residential and cellular cold calls.  In addition, DIRECTV regularly issued reminders that Telecel was required to continue implementation of

16

national do-not-call procedures in compliance with the TCPA.  Diaz Dep. at 112.

Cordoba contends that DIRECTV was aware of Telecel's TCPA violations and that its knowledge coupled with inaction amounts to assent and a grant of authority, comparing DIRECTV's inaction to that of the defendant in Krakauer v. Dish Network L.L.C., No. 1:14-CV-333, 2017 WL 2455095 (M.D.N.C. June 6, 2017).[6]  Pl.'s Opp'n at 17-20.  However, Krakauer is distinguishable because Cordoba only provides evidence that DIRECTV was aware of one instance of Telecel making a cold call, and that call was placed to "[a]n existing DIRECTV customer . . . ."[7]  Email from Manuel Escobar to Sasha Labrada (June 5, 2014, 2:19 PM).  In contrast, the evidence produced in Krakauer demonstrated that the defendant's knowledge of violations was more widespread: the defendant knew

---

[6] Cordoba also asserts that DIRECTV was required by an injunction to monitor the actions of Telecel because Telecel was an "authorized telemarketer" under the terms of the injunction.  Pl.'s Opp'n at 2-3, 23; see also Stipulated J. and Order for Permanent Inj. Against DIRECTV, Inc., United States of America v. DIRECTV, Inc., et. al., No. 09-02605 (C.D. Cal. May 14, 2009) (the "2009 Injunction") [Doc. 217-10].  Regardless of whether the 2009 Injunction applies to Telecel's activities and DIRECTV's duty to monitor them, that issue is not probative of the scope of Telecel's actual authority vis-à-vis DIRECTV because the evidence shows that Telecel was unaware of the injunction.  See Diaz Dep. at 201-02.

[7] Although Cordoba himself alleges he complained to DIRECTV about the calls he received, there is no evidence that DIRECTV or Cordoba knew which of its marketing partners, if any, was initiating those calls.  See Cordoba Decl. ¶¶ 8-17, 19-22.

that instructions to avoid cold calling were being ignored, knew the marketer was

using a calling list containing names on the national do-not-call registry, never

took disciplinary action, and only instructed the marketer to stop calling

individuals who complained about calls rather than to cease cold calling entirely.

See Krakauer, 2017 WL 2455095, at *3-4.  Cordoba also cites United States v.

Dish Network L.L.C., 954 F.3d 970 (7th Cir. 2020), but that case also is

distinguishable because (1) the district court found that the defendant knew about

the calls violating the TCPA and (2) the opinion references only a vague

instruction to the telemarketer to obey all applicable laws rather than a specific ban

on cold calling.  Id. at 976-77.  In contrast, aside from the single call to an existing

DIRECTV customer, which led to a warning from DIRECTV to Telecel and the

termination of the sales person who made the call, there is no evidence in this case

that DIRECTV was aware that Telecel was making unsolicited cold calls, but it is

clear that DIRECTV instructed Telecel not to engage in such a practice.  See, e.g.,

CDA, Sched 2.6; Cover Letter, DIRECTV Policy Statement at 1.  Thus, viewing

the evidence in a light most favorable to Cordoba, the Court finds that the evidence

demonstrates that Cordoba's Cold Calls were not within the scope of Telecel's

actual authority.  See McDermet, 2021 WL 217336, at *8 (finding that there was

no evidence that DIRECTV's authorized retailers had express or implied authority

to make telemarketing calls to the plaintiff).

**B.  Whether Telecel Had Apparent Authority to Make Cold Calls on Behalf of DIRECTV**

DIRECTV asserts that Telecel did not have the apparent authority to place the Cold Calls because DIRECTV never represented that Telecel was an agent authorized to do so and Cordoba never relied on any such representation to his detriment.  Mot. for Summ. J. at 22-23.  In response, Cordoba contends that, pursuant to the Restatement of Agency and FCC rulings, DIRECTV's relationship with Telecel had all the markings of apparent authority.  Pl.'s Opp'n at 20-23.

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and <u>that belief is traceable to the principal's manifestations</u>."  RESTATEMENT (THIRD) OF AGENCY § 3.03 (2006) (emphasis added).  "'Apparent authority' does not exist unless the principal indicates (through words or conduct) to the third party that another person is authorized to act as the principal's agent."  <u>D&M Carriers LLC</u>, 586 F. App'x at 571 (quoting RESTATEMENT (THIRD) OF AGENCY § 3.03).  This belief can arise when the principal "knowingly permits the agent to act as if the agent is authorized . . . ."  <u>Whetstone Candy Co. v. Kraft Foods, Inc.</u>, 351 F.3d 1067, 1078 (11th Cir. 2003).  The rationale behind apparent authority is to hold "a principal accountable

19

for the results of third-party beliefs about an actor's authority to act as an agent . . .

." RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. c (2006).

The Eleventh Circuit applies a three-pronged test for determining whether an agent has apparent authority. Franza v. Royal Caribbean Cruises, Ltd., 772 F.3d 1225, 1252 ("[W]e have repeatedly observed that apparent agency liability requires finding three essential elements: first, a representation by the principal to the plaintiff, which, second, causes the plaintiff reasonably to believe that the alleged agent is authorized to act for the principal's benefit, and which, third, induces the plaintiff's detrimental, justifiable reliance upon the appearance of agency."). This precedent undermines Cordoba's claim that Telecel had the apparent authority to conduct the Cold-Calls.[8]  First, Cordoba has not provided any evidence showing that DIRECTV represented to him that it had authorized the Telecel Cold Calls. To the contrary, in his written correspondence with DIRECTV, Cordoba refers to calls from a "third party vendor" or "marketing partner," and DIRECTV's responses to these emails mentioned that removal from DIRECTV's internal do-not-call list "does not impact activities of independent retailers, who may promote

---

[8] In support of his argument that Telecel had apparent authority, Cordoba cites to opinions from the FCC, Pl.'s Opp'n at 20-22, but FCC opinions at best serve only as "guidance" rather than as binding authority for courts. See McDermet, 2021 WL 217336, at *9 (citing cases).

DIRECTV services or products . . . ."  Email from Sebastian Cordoba to Ron Hyland (Jan. 8, 2015, 5:06 PM) [Doc. 114-11 at 3-7]; Email from DIRECTV Customer Service to Sebastian Cordoba (Jan. 9, 2015, 5:51 PM) [Doc. 114-12 at 2-6].  The email exchanges between DIRECTV and Cordoba demonstrate (1) that DIRECTV maintained the position that it did not sanction cold calling or that it approved or encouraged the actions of its independent retailers and (2) that Cordoba was aware that DIRECTV did not sanction or authorize the activity.

Second, assuming *arguendo* that DIRECTV represented that Telecel was its agent authorized to place the Cold Calls, nothing in the record indicates that Cordoba or any other proposed class member reasonably relied upon such a representation, much less that such reliance was to any class member's detriment. See Thomas v. Taco Bell Corp., 582 F. App'x 678, 679 (9th Cir. 2014) (quoting NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity, 124 F.3d 1094, 1099 (9th Cir. 1997)) ("Apparent authority is inapplicable because it can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.'").  Thus, viewing the evidence in a light most favorable to Cordoba, the Court finds that the evidence demonstrates that Telecel did not have apparent authority to place the Cold Calls on behalf of DIRECTV.

### C.    Whether DIRECTV Ratified Telecel's Cold Calls

Cordoba also alleges that "DIRECTV ratified Telecel's telemarketing activities and each telemarketing call that is the subject of this action[,]" and that DIRECTV is thus liable under the agency principle of ratification.  Third. Am. Compl. ¶¶ 16, 57.  "The doctrine of ratification starts with the assumption that the agent did not have actual authority at the time he acted."  GDG Acquisitions LLC v. Gov't of Belize, 849 F.3d 1299, 1310 (11th Cir. 2017) (citation omitted).  "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done for an agent acting with actual authority."  RESTATEMENT (THIRD) OF AGENCY § 4.01(1) (2006).  "A person ratifies an act by . . . manifesting assent that the act shall affect the person's legal relations, or . . . conduct that justifies a reasonable assumption that the person so consents."  Id. § 4.01(2).  "In order to prove vicarious liability through ratification, the Plaintiff bears the burden of showing: (1) the existence of a principal-agent relationship; (2) that the principal accepted the benefits of the unauthorized act; (3) with full knowledge of the facts under circumstances demonstrating the intent to adopt the unauthorized agreement."  Cabrera v. Gov't Emps. Ins. Co., 452 F. Supp. 3d 1305, 1320 (S.D. Fla. 2014) (citing Thomas, 582 F. App'x at 679-80).

Cordoba has not produced evidence to support the latter two elements of

22

ratification. While Cordoba alleges that DIRECTV "retained the benefits of Telecel's illegal cold-calling," Pl.'s Opp'n at 25, this assertion is not supported by the evidence in the record. Telecel did sell a significant number of DIRECTV subscriptions; however, Cordoba has failed to specifically identify a single DIRECTV subscription obtained through the use of cold calling. Telecel's growing business and opening of new call centers does not show that DIRECTV retained a benefit from the Cold Calls because sales generated through Telecel's legal and authorized advertising strategies required the use of call centers. See Diaz Dep. at 19-21.

In addition, the evidence before the Court fails to show that DIRECTV had knowledge of the Cold Calls or demonstrated an intent to adopt or encourage Telecel's practice of conducting Cold Calls. To the extent that Cordoba argues that the 2009 Injunction put DIRECTV on notice of the potential for its retailers to engage in cold calling, that argument is inapposite. See RESTATEMENT (THIRD) OF AGENCY § 4.06 cmt. b (2006) ("Ratification requires that the principal have actual knowledge of material facts, not notice as defined in § 1.04(4)."). Moreover, DIRECTV's response to the one instance of cold calling reveals that DIRECTV reprimanded Telecel and, in an act contrary to ratification, reiterated the order that Telecel should not engage in cold calling. See Email from Manuel Escobar to

Sasha Labrada (June 5, 2014, 2:19 PM); Email from Sasha Labrada to Micky Girgis (June 10, 2014, 11:24 AM); Email from Manuel Escobar to Micky Girgis (June 18, 2014, 5:10 PM). Therefore, the Court finds that there is insufficient evidence to create a triable issue of material fact as to whether DIRECTV ratified the Cold Calls.

## VI.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that DIRECTV's Motion for Summary Judgment [Doc. 204] is **GRANTED** as to certified NDNC class claims and Cordoba's individual IDNC claims in Counts I and II of the Third Amended Class Action Complaint.

The only remaining claim in this case is the alleged violation of STELA as set forth in Count III of the Third Amended Complaint, which is subject to arbitration. It is further **ORDERED** that this action is **STAYED** and shall be **ADMINISTRATIVELY CLOSED** pending completion of the arbitration of that remaining claim. The parties shall notify the Court upon completion of arbitration,

and either party shall have the right to move to reopen this case to resolve any

remaining issues of contention.

      **IT IS SO ORDERED** this 12th day of February, 2021.

_____
MARK H. COHEN
United States District Judge